IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA,
    Plaintiff,

vs.                                              Case No. 3:08mj109/EMT

PAUL D. ROUNTREE,
    Defendant.
_____/

## ORDER DENYING MOTION TO SUPPRESS

Now before the court is Defendant's Motion to Suppress (Doc. 11), the Government's response in opposition thereto (Doc. 12), and Defendant's reply (Doc. 19). Defendant asks this court to suppress "all evidence obtained by the Government after the unlawful detention and/or arrest of the Defendant" (Doc. 11 at 1, 3). Defendant contends that his detention and arrest, "including the videotaping of Defendant at the scene," were "without a founded reasonable suspicion or probable cause and violated his constitutional rights to be free of unlawful searches and seizures" pursuant to the Fourth Amendment (*id.* at 3). In opposing Defendant's motion, the Government asserts that searches on closed military bases are exempt from the usual probable cause requirement, and moreover, that even if probable cause were required, probable cause existed for Defendant's arrest (Doc. 12). A hearing on Defendant's motion to suppress was held September 16, 2008. For the reasons stated on the record, as well as the reasons outlined in this order, Defendant's motion to suppress will be denied.

For purposes of this order, the facts set forth herein are undisputed.[1] At approximately 2:55 a.m., on February 20, 2008, Defendant was driving a vehicle, and he approached the main gate of the Pensacola Naval Air Station (NAS) where he encountered Officer Jerome Williams. Officer

---

[1] Only those facts pertinent to the suppression issues are included in this order.

Case No. 3:08mj283/EMT

Williams is a Department of Defense police officer, who has worked as such aboard NAS for approximately six years.  His duties include working as a gate guard/sentry and routine patrol officer, where he is responsible for, among other things, enforcing traffic regulations such as those prohibiting driving under the influence (DUI) and determining whether persons attempting to enter NAS are in possession of a valid driver's license, registration, and proof of insurance.  In the course of his work as an NAS police officer, Officer Williams has interacted with impaired drivers, and he is familiar with the typical signs of impairment, such as an odor of alcohol, red or watery eyes, and slurred speech.

On February 20, 2008, Officer Williams was working the midnight shift (i.e., from 9:30 p.m. on February 19, through 5:30 a.m. on February 20) as a gate sentry at the NAS main gate.  At approximately 2:55 a.m., he noticed a vehicle coming across the bridge (i.e., traveling south on the bridge, toward the NAS main gate) that appeared to be "hesitant" and/or the driver of which appeared to be unsure of where he was going.  When the vehicle arrived at the guard gate, Officer Williams first encountered the Defendant, who was driving the vehicle.  The driver's side window was down, and Officer Williams detected an odor of alcohol emanating from the vehicle and/or the Defendant's person.[2]  Defendant told Officer Williams that he was lost, and he admitted that he had "had a few drinks."  Officer Williams additionally noted that Defendant's eyes were red and watery, his speech was slurred, and he was "uncoordinated" when he was trying to obtain documents requested by Officer Williams (such as proof of insurance).  Thus, Officer Williams told Defendant to put his car in park, turn off the car, and put the keys on the dashboard.  Defendant complied.  Next, Defendant was asked to perform field sobriety tasks (FSTs), so Defendant got out of the car, went to a safe area, and was observed by Officer Williams for 20 minutes before beginning the FSTs.

The FSTs were videotaped, and the videotape was introduced during the suppression hearing.  The videotape is obviously the best evidence of Defendant's performance, but a brief summary of its contents is warranted here.  Initially, Defendant advised Officer Williams that he had just had a right hip replacement.  Nevertheless, Defendant was asked to perform the one leg stand (OLS).

---

[2]Officer Williams later testified that after Defendant exited the vehicle, he noticed an odor of alcohol emanating from Defendant's <u>person</u>.

Case No. 3:08mj283/EMT

During the preparation for this FST, Defendant further advised Officer Williams that he has 3–4 herniated discs in his back.  Ultimately, Defendant was not required to perform the OLS, and Officer Williams did not consider this (attempted) FST in determining whether Defendant should be arrested for DUI.  Next, Defendant was asked to perform the "finger to nose" (FTN) task.  Although Defendant blames his poor performance on the FTN test on his physical condition, he is clearly swaying during the test and at one point he stumbled or fell forward.[3]  For Defendant's safety, the test was stopped.  Finally, Defendant was asked to perform the "heel to toe" (HTT) task.  Although Defendant correctly counted nine steps forward, his movements were far slower than those exhibited by Officer Williams when he demonstrated the HTT to Defendant, and Defendant turned before being directed to do so.  Based on the totality of the circumstances (namely, Defendant's "hesitant" driving, admission that he had been drinking, odor of alcohol, slurred speech, blood shot and/or watery eyes, lack of coordination, and performance on the FTN and HTT tasks), Defendant was arrested for DUI.

Additionally, and pertinent to the issues at bar, Officer Williams described the area leading up to and surrounding the guard gate where he first encountered Defendant.  Of note, Officer Williams indicated that a person, such as Defendant, would approach the NAS main gate by traveling south on Navy Boulevard, and then crossing a bridge.  He noted that once a driver has gone beyond the "water's edge" on the NAS side of the bridge, and beyond an available turnaround point, the person has already "entered" the base and is on exclusive federal property.  Therefore, a person who presents himself at the guard gate is already within the confines of NAS.  Moreover, before a person even gets on the bridge (and when the person has the option, for example, of turning off Navy Boulevard and onto a side street, thereby avoiding NAS altogether), and certainly once on the bridge, a person can see large, lit, signs indicating that all vehicles entering NAS are subject to search.  Additionally, even beyond the signs warning about possible searches, there is a lawful area for making a U-turn (as opposed to approaching the guard gate).  Finally, Defendant testified that he crossed the bridge leading to NAS <u>twice</u> in the early morning hours of February 20, 2008 — once

---

[3]The court (having closely watched the videotape) concludes, as did Officer Williams, that it is unlikely that Defendant's swaying and stumbling are solely attributable to Defendant's physical condition, as opposed to his admitted consumption of alcohol.

Case No. 3:08mj283/EMT

when he encountered another sentry, and the second time when he encountered Officer Williams. Thus, at a minimum, Defendant would have seen the warning signs regarding searches the first time he crossed the bridge (if he had not seen them from Navy Boulevard prior to getting on the bridge), but he chose to go over the same bridge a second time, again passing the signs warning about searches, and he presented himself at the guard gate a second time.

Defendant was later charged in a one-count information with DUI, in violation of Fla. Stat. § 316.193 and Title 18, U.S.C. §§ 7 and 13. In the motion under consideration Defendant argues that Officer Williams did not have reasonable suspicion to order Defendant out of his car since there was no traffic violation and the "mere odor of alcohol, watery and red eyes did not give him [Officer Williams] lawful authority to ask Defendant to turn off his vehicle and exit same for physical sobriety tasks" (Doc. 11 at 2–3).

In response to Defendant's motion, the Government argues that searches on closed military bases are exempt from the probable cause requirement of the Fourth Amendment (Doc. 12 at 4). See United States v. Ellis, 547 F.2d 863, 866 (5th Cir. 1977) (defendant "certainly should have realized that his actions in presenting his vehicle to the guard at the entrance to the Air Station with an implied request to drive aboard carried the possibility of an inspection then and there").[4] The Government also asserts that even if the court determines that the Fourth Amendment applies to this situation, there was probable cause for Defendant's arrest (Doc. 12 at 4–5). The Government argues that Defendant's odor of alcohol, uncoordinated movements, bloodshot eyes, admission that he had had a few drinks, and failure to adequately perform two FSTs established probable cause for Officer Williams to arrest Defendant for DUI (*id.* at 5).

In his reply to the Government's responsive memorandum, Defendant argues that he had no intention to enter the base prior to being ordered out of his vehicle by Officer Williams (Doc. 19 at 2). Thus, he argues that his actions (i.e., presenting himself at the NAS main gate) did not constitute a waiver of his Fourth Amendment rights, and therefore, the Government must show that Officer Williams had sufficient probable cause to believe that Defendant had committed a crime or traffic

---

[4]In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all former Fifth Circuit decisions rendered before October 1, 1981.

Case No. 3:08mj283/EMT

violation prior to him ordering Defendant to turn off and exit his vehicle (*id.* at 3). In support, Defendant notes that the court in Ellis, 547 F.2d at 866, specifically noted that it was not addressing the waiver issue (i.e., of Fourth Amendment rights) where a person does not actually enter the base and intends to turn around before requesting entry onto the base.

Defendant is correct in noting that the facts in Ellis concern the search of a vehicle that was well within the confines of, coincidentally, Pensacola NAS, and that the defendant there had "validly consented to the subsequent search" of his vehicle by entering onto the premises. *Id.* Additionally, the Ellis court indeed noted that it was not "reaching the question of whether [the defendant] had a right to turn back at the gate." *Id.* Thus, Defendant asserts that because he was only at the entrance gate, stated he was "lost" and had no intention of entering NAS, he did not validly consent to a search or inspection of his vehicle. The court cannot agree.

First, the evidence adduced at the hearing establishes that anyone entering NAS at the main gate is clearly forewarned that his or her vehicle is subject to search. Moreover, the search warning signs are visible before getting on the bridge (and a person can turn off Navy Boulevard to avoid getting on the bridge), and that even after getting on the bridge and passing under the warning signs, a person still has an opportunity to turn around. Additionally, if the person chooses not to turn around and approaches the main gate, the person is already within the confines of NAS. At a minimum, a person in these circumstances has clearly presented to the gate with "an implied request" to drive aboard. *Id.* ("[The defendant] certainly should have realized that his actions in presenting his vehicle to the guard at the entrance to the Air Station with an implied request to drive aboard carried the possibility of an inspection then and there."). In the instant case, however, it is even more clear that Defendant "certainly should have realized" his actions would subject him and his vehicle to a search, given that he twice presented himself to the main gate, twice passed signs clearly indicating that his vehicle would be subject to a search, and twice choose to pass all points of turnaround before approaching the gate.

The court is aware of a Tenth Circuit case holding that the usual probable cause requirement exists "once a determination has been made not to allow defendant entry to the base." United States v. Vaughn, 475 F.2d 1262, 1264 (10th Cir. 1973). The rationale behind this holding is that the interest or purpose in protecting the security of a military base is not involved if a person is going

to be denied entry. *Id.* In <u>Vaughn</u>, however, the base commander had previously ordered that <u>no</u> visitors, such as the defendant in <u>Vaughn</u>, would be allowed on base, so there was no chance of the defendant being permitted entry. *See id.* at 1264–65. In the instant case, however, the facts do not suggest that a determination had been made by Officer Williams to deny Defendant entry aboard NAS. Indeed, Officer Williams had the discretion to permit his entry. In other words, unlike the circumstances in <u>Vaughn</u>, NAS was not closed to visitors (by order of the base commander or otherwise) at the time Defendant approached the gate. Moreover, at the point Defendant encountered Officer Williams, he was already within the confines of NAS, and it would have been necessary for him to proceed even further aboard NAS — albeit only a short distance — to turn around and exit the base. Thus, the court finds the reasoning of the <u>Ellis</u> court applicable here. Accordingly, after considering all of the evidence presented at the suppression hearing and the arguments of the parties, the court finds that Officer Williams did not need reasonable suspicion to detain or order Defendant out of his vehicle, or probable cause to arrest him. Defendant waived his Fourth Amendment right to be free from unlawful searches and seizures when he drove aboard a closed military base (twice) that was clearly marked with lit signs indicating that vehicles entering NAS are subject to search.

Moreover, even if probable cause were required, the court finds that a reasonable suspicion/probable cause existed to detain and subsequently arrest Defendant for DUI. Specifically, Defendant hesitated as he approached the main gate, he admitted to having a few drinks, an odor of alcohol was emanating from his person, his speech was slurred, he had red and watery eyes, he was uncoordinated in his attempts to obtain and provide documentation to Officer Williams, and he failed to adequately perform the FSTs (FTN and HTT).

Accordingly, it is **ORDERED**:

Defendant's motion to suppress (Doc. 11) is hereby **DENIED**.

**DONE AND ORDERED** at Pensacola, Florida this 17th day of September 2008.

/s/ *Elizabeth M. Timothy*
ELIZABETH M. TIMOTHY
UNITED STATES MAGISTRATE JUDGE